# EXHIBIT 6

**In the Matter Of:**

*Maldonado vs*

*Higher Education Loan Authority*

*MEGAN LYNN BATES*

*July 15, 2026*

LEXITAS™

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JAIME MALDONADO, ANNA VARELA, ALMA GARY and JEFF PLAMONDON, individually and on behalf of all others similarly situated, | ) | No. 3:24-CV-07850-VC |
| Plaintiffs, | ) | Assigned to Hon. Vince Chhabria |
| -vs- | ) | |
| HIGHER EDUCATION LOAN AUTHORITY OF THE STATE OF MISSOURI, and DOES 1-30, | ) | |
| Defendants. | ) | |

CONTINUED DEPOSITION OF MISSOURI HIGHER EDUCATION LOAN AUTHORITY, THROUGH MEGAN LYNN BATES, via Zoom videoconference, produced, sworn and examined on Wednesday, July 15, 2026, before:

MARY KERKVLIET IVEY
Missouri C.C.R. 529
Kansas CSR 863

in a certain cause now pending in the United States District Court, Northern District of California, wherein JAIME MALDONADO, ANNA VARELA, ALMA GARY and JEFF PLAMONDON, individually and on behalf of all others similarly situated, are Plaintiffs and HIGHER EDUCATION LOAN AUTHORITY OF THE STATE OF MISSOURI, and DOES 1-30 are Defendants.

Taken on behalf of Plaintiffs

INDEX


| | | Page |
|---|---|---|
| Examination by Ms. Haswell | | 8 |
| Examination by Ms. Fradette | | 200 |
| Re-Examination by Ms. Haswell | | 238 |


EXHIBITS

BATES DEPOSITION EXHIBITS


| | | |
|---|---|---|
| Exhibit 216 | Document Entitled Re: For Review: R2R Review August E-mail - MOHELA | 111 |
| Exhibit 217 | Document Entitled Role of a Servicer and Actions to Prepare For Repayment | 114 |
| Exhibit 218 | Document Entitled Return to Repayment, Student Debt Relief, and Income Driven Repayment New Communications Playbook | 114 |
| Defense 1 | Requirements FSA Has For MOHELA | 201 |
| Defense 2 | Business Operations Change Request Form | 216 |
| Defense 3 | 2025 Credit Reporting Resource Guide | 221 |
| Defense 4 | KSM Resource | 224 |

EXHIBITS (continued)

| | | |
|---|---|---|
| Defense 5 | OneNote Resource | 235 |

EXHIBITS MARKED IN PREVIOUS DEPOSITIONS

| | | |
|---|---|---|
| Exhibit 51 | Notice of Violation of California Student Borrower Bill of Rights | 168 |
| Exhibit 52 | Varela Letter to MOHELA Dated 5/26/2024 | 176 |
| Exhibit 53 | Plamondon Letter to MOHELA Dated 5/1/2024 | 132 |
| Exhibit 54 | Gary Letter to MOHELA Dated 5/13/2024 | 196 |
| Exhibit 65 | Internal Servicing System When Receiving or Responding to a Secure Message | 146 |
| Exhibit 94 | Response to Varela Inquiry in Exhibit 52 Dated 5/14/2024 | 179 |
| Exhibit 126 | Secure Message Through Web Portal | 117 |
| Exhibit 130 | MOHELA Letter to Plamondon Dated 6/17/2024 | 141 |
| Exhibit 150 | Letter to Jaime Maldonado | 172 |
| Exhibit 151 | MOHELA Letter to Maldonado Dated 9/10/2024 | 175 |

(Exhibits electronically provided to counsel.)

STIPULATIONS

It is hereby stipulated and agreed by and between counsel for the respective parties and the witness that said deposition shall be signed before the time of trial.

APPEARANCES

For Plaintiffs:

Ms. Malachi J. Haswell
KEMNITZER BARRON & KRIEG, LLP
1120 Mar West, Suite C2
Tiburon, California 94920
Phone: 415-632-1900
E-mail: kai@kbklegal.com

and

Ms. Rebecca Eisenbrey
Mr. Malik Jarvis
PROJECT ON PREDATORY
STUDENT LENDING
769 Centre Street
Jamaica Plain, Massachusetts 02130
Phone: 617-322-2200
E-mail: reisenbrey@ppsl.org
mjarvis@ppsl.org

and

APPEARANCES (Continued)

Mr. Daniel "Sparky" Abraham
JUBILEE LEGAL
300 East Esplanade Drive
Suite 900
Oxnard, California 93036
Phone: 805-946-0386
E-mail: sparky@jubilee.legal

For Defendants:

Ms. Jacquelyn E. Fradette
Ms. Jazmyne Denman
SIDLEY AUSTIN LLP
1501 S Street, NW
Washington, DC 20005
Phone: 202-736-8822
E-mail: jfradette@sidley.com
jazmyne.denman@sidley.com

and

Ms. Julie Becker
SIDLEY AUSTIN, LLP
One South Dearborn
Chicago, Illinois 60603
Phone: 312-853-3604
E-mail: julie.becker@sidley.com

APPEARANCES (Continued)

Also Present:

Mr. Mark Raschess

Vice President

Associate General Counsel

MOHELA

(The deposition commenced at 10:04 a.m. CDT.)

MEGAN LYNN BATES,

(of lawful age, having been sworn, testified as follows:)

MS. HASWELL: Good morning. This is the 30(b)(6) deposition in Maldonado versus MOHELA, Docket No. 24-CV-07850-VC.

EXAMINATION BY MS. HASWELL:

Q. Ms. Bates, could you please state your name for the record and spell it out?
A. Yes. Megan Bates, M-e-g-a-n B-a-t-e-s.
Q. Thank you. Have you ever been deposed before?
A. I have, yes.
Q. In what context have you been deposed?
A. As a corporate representative for MOHELA for a single borrower.
Q. Did that case relate to borrower defense?
A. It did not, no.
Q. Okay. And how long ago was that?
A. Possibly 2023, approximately.
Q. Is that the only deposition that you've had taken?

direction from FSA to MOHELA that MOHELA must report borrower tradelines to CRAs?

MS. FRADETTE: Object to the form. Go ahead.

A. There are applicable USDS requirements that do advise we need to report and how we need to report and the frequency in which we need to report. So if -- for my purposes, the USDS requirements would be direction from FSA.

Q. (By Ms. Haswell) And when you say the USDS requirements, are you referring to the requirements in the USDS contract?

A. Correct, yes.

Q. For an FSA loan that's serviced by MOHELA, is it possible for MOHELA to suppress or decline to report borrower tradelines to CRAs?

MS. FRADETTE: Object to the form. Go ahead.

A. We technically, meaning systematically, have a way to suppress or bypass loan reporting for a time period. And again, to step back, suppress or bypass to me means that, again, we place the pause button on

that borrower's credit reporting and we would not credit report for a time period, whether that is one month or multiple months.

We do have that technical ability through the servicing system, and there are a -- I don't have the specifics, but I can recall one instance in which we are directed to bypass or suppress accounts in an ID theft or fraudulent capacity.

Q. (By Ms. Haswell) In that context that you just mentioned, the fraud context, when would MOHELA suppress a borrower's tradeline with the CRAs?

MS. FRADETTE: Object to the form.

A. Currently I believe there are information -- or there is information to potentially bypass or suppress if there is a pending ID theft application or affidavit that is being reviewed by FSA.

Q. (By Ms. Haswell) Would MOHELA immediately suppress the tradeline upon receiving a complaint of ID theft or would that come later in the process of investigating the

understanding that FSA requires MOHELA to report tradelines under the USDS contract?

A. Yes, that is outlined in the USDS contract.

Q. And you mentioned that there are some circumstances where MOHELA suppresses credit reporting where a borrower's balance is in question, for example, in cases of identity theft; is that right?

A. Yes.

MS. FRADETTE: Object. Go ahead.

A. Sorry. Yes, so we would -- MOHELA would suppress if applicable when outlined by, you know, FSA.

Q. (By Ms. Haswell) Okay. And is it your understanding that the change request for the group discharges prohibits MOHELA from suppressing tradelines for borrowers with loans subject to group discharge?

MS. FRADETTE: Object to the form. Go ahead.

A. I would say that the CR advises MOHELA or instructs MOHELA how to credit report or process group discharges.

Q. (By Ms. Haswell) Is that instruction, to

your understanding, applicable to the entire timeline for that borrower's account? For example, is it your understanding that the change request provides instructions to MOHELA on credit reporting before the borrower's discharge has been processed?

MS. FRADETTE: Object to the form. And if you're going to ask her about what the change request says, I would like you to show it to her.

MS. HASWELL: I can bring that up in a minute, but I'm trying to follow up on a question that she answered earlier in her understanding of the change request requirements.

Q. (By Ms. Haswell) Did you say earlier that it's your understanding that the change request directs MOHELA to continue credit reporting before a discharge has been processed?

MS. FRADETTE: Object to the form. And again, I'm going to ask you to show her the document.

Q. (By Ms. Haswell) Ms. Bates, are you able

to answer the question?
A. Yeah. If we needed the specific language, I would need to have the CR or the change request pulled up in front of me for verbatim language; however, generally, the CR does provide instruction for MOHELA and -- instructions how to credit report during that time, or I should say in that situation.
Q. What general process does MOHELA use to respond to consumer credit disputes?
A. So generally credit disputes can be received in two ways, one of which would be indirect disputes or ACDVs, and they are received through a third-party web-based service called e-Oscar, so they are not sent directly to us but MOHELA retrieves the dispute through e-Oscar.
The second method or the second avenue would be a direct dispute in which that dispute was mailed directly to MOHELA.
Q. What is MOHELA's process for responding to ACDVs received through e-Oscar?
A. Again, generally, there are policies and procedures that are available, excuse me,

Q. (By Ms. Haswell) Is it your understanding that the templates and guidance used by MOHELA in responding to borrower inquiries like this were modified over time?

MS. FRADETTE: Object to the form.

A. Did you specify templates or guidance? I apologize, I missed that wording.

Q. (By Ms. Haswell) I said guidance or templates or whatever the agent would have been reviewing in order to craft this response to Mr. Plamondon. Would that guidance have been different at the time that this correspondence was drafted versus now?

MS. FRADETTE: Object to the form.

A. Through OneNote or KSM, MOHELA does strive to provide agents as much information as quickly as possible in real time. So looking at borrower defense today compared to any guidance that may have been available in 2023 may have evolved or changed in the last three years.

Q. (By Ms. Haswell) Okay. And just to make

sure I'm understanding, it's not your understanding of the process that an agent responding to this communication would have spoken to other departments in MOHELA, for example, the departments reviewing the group discharge lists, to learn whether Mr. Plamondon's name was or was not on a group discharge list before responding to this correspondence?

MS. FRADETTE: Object to the form.

A. The communications agents would utilize what is on the servicing system, so they would not reach out to FSA on an individualized basis. We do need to rely on the other teams and the business units to complete their work as part of the process or their potential work as part of the process, and the communications teams would utilize the servicing notes.

Q. (By Ms. Haswell) Okay. When MOHELA's response says, At this time we have not received updates, do you understand that to mean the communications/CAT team that specifically responded to that

and their policies, procedures in KSM when reviewing and responding to the borrower inquiry and the context that's on the account at the time.

Q. (By Ms. Haswell) Okay. Thank you. I am about to ask about another series of documents that are all related and that might take awhile, so this might be a good time for our next break.

MS. FRADETTE: Yeah. Sounds good.

MS. HASWELL: And we are going through this fairly quickly. I'm not worried about time. So does another ten minutes sound good to everyone?

MS. FRADETTE: Yeah, that sounds great.

MS. HASWELL: Okay.

(Whereupon, a break was taken.)

Q. (By Ms. Haswell) Ms. Bates, could you please open Exhibit 53? And the Bates number for this document begins at MOHELA_001749.

A. Yes.

Q. And when you have it open, take a moment to

review it and let me know when you've had a chance to look it over.
A. Okay, thank you. Just to ensure I have the correct document, eight pages and it does have Mr. Plamondon's name and address in the top left.
Q. That's right.
A. Perfect, okay, thank you.
Is page 2 blank?
Q. Yes, unfortunately, it is on my copy as well. I believe that was how it was produced to us, possibly because it was a single-sided document.
A. Okay, just wanted to ensure I didn't have a glitch on my side here.
Okay. Give me a few more moments, please.
Q. Uh-huh.
A. Okay. And just confirming that there were a few other blank pages throughout the document as well, correct?
Q. Yes. It looks like every other page is blank on my copy.
A. Okay, thank you. Okay. Okay, thank you.
Q. Do you recognize this document?

A. I may have seen this in preparation for today, uh-huh.
Q. What is it?
A. It does look to be -- with the context and the header here, it does appear to be a letter from the borrower, yes.
Q. And what's the, like, subject matter of the correspondence?
MS. FRADETTE: Object to the form.
A. Can I zoom out here and say the title of the document is the Notice of violation for California Student Borrower Bill of Rights.
Q. (By Ms. Haswell) Is this a document that you would understand to be a complaint from a borrower?
MS. FRADETTE: Object to form.
A. This may -- can you rephrase your question, please, regarding understanding?
Q. (By Ms. Haswell) Yeah. So when you've been talking about the CAT team, my understanding is the CAT team's responsibilities include responding to borrower complaints. And my question is whether this correspondence is something

that MOHELA would classify as a complaint from a borrower.

MS. FRADETTE: Object to the form. Go ahead.

A. So I don't have the specifics of where this letter may have been routed to, like a specific queue to work out of, but I would, with some of the context here, believe that this may be routed to a CAT queue for review, the consumer advocacy team.

Q. (By Ms. Haswell) Is there anywhere else this would have been routed besides CAT?

A. Yes. So potentially here, if the CAT team needs assistance, especially with some of the federal violations that are listed, they may certainly reach out to the legal team to assist with a response.

Q. Would correspondence of this type, for example, that mentions violations of specific laws go to the legal department in the first instance or would it go to CAT?

MS. FRADETTE: Object to the form. And I'm just going to instruct, Megan, that you can refer to things getting referred to legal but don't

discuss any communications relating to legal after that point.

THE WITNESS: Understood.

A. And typically legal does also have their own work queues as well, just the same as CAT or the credit team does, so I don't perform the routing of the information when it's received by MOHELA.

So in the CAT perspective or the communications perspective, if it is routed to one of those teams or through that avenue first and assistance is required, then the CAT communications team can also forward or loop in legal for any assistance.

Q. (By Ms. Haswell) Got it, thank you. What team or department in MOHELA is responsible for that routing?

MS. FRADETTE: Object to the form.

A. The routing of incoming documentation, is that what you are referencing there?

Q. (By Ms. Haswell) Yeah. Incoming correspondence from consumers to MOHELA, who decides where to route that

correspondence?
MS. FRADETTE: Object to the form. Go ahead.
A. That is typically handled outside of the CAT communications team and the credit team and I do believe that an intake process would live with potentially the support services units.
Q. (By Ms. Haswell) Do you know who in MOHELA would have more information about the process of how communications are routed within MOHELA?
MS. FRADETTE: Object to the form.
You can answer in your individual capacity to the extent you know.
A. Not a specific name, but that is the business unit or the department that completes that work, so again, how they have the specifics within that department, I don't -- I don't have an individual.
Q. (By Ms. Haswell) Do you know whether this specific communication was routed to the CAT team?

MS. FRADETTE: Object to form.
You can answer to the extent you know.

A. With just the information that's on the letter or within the PDF here, there is no specific indication that tells me where it was routed.

Q. (By Ms. Haswell) Okay. And outside of the document itself, you don't have other knowledge regarding how this document was routed; is that right?

A. No specifics besides the general process of the CAT queues and the potential legal queues that I already outlined.

Q. Okay, thank you.

A. Uh-huh.

Q. What actions did MOHELA take in response to this correspondence from Mr. Plamondon?

MS. FRADETTE: Object to the form.

A. I am really only seeing the letter that's been received. I don't have any other context as to a specific response or guidance that we provided in response to this letter here; however, again, policies

and procedures within MOHELA, if we do receive a borrower inquiry, we are going to go ahead and review and respond accordingly.

Q. (By Ms. Haswell) The review process you mentioned, is that the same review process that you outlined with respect to the last exhibit that we looked at or is there a different process for communications of this kind versus messages received on MOHELA's secure portal?

MS. FRADETTE: Object to the form.

A. Really, the overall process utilizing the KSM, the OneNote procedures that exist, that would now -- the procedures will differ based on intake medium here or method; however, the review of the account will still generally be the same, the same to review and respond to the borrower's specific inquiry.

So while the specific servicing screens may differ based on the inquiry, that is possible; however, it would also outline if there is any, again, legal language that's

included and assistance is required or requested from the legal team, additional guidance on where to route that and what queue to populate.

Q. (By Ms. Haswell) Do you know what specific steps MOHELA took to respond to this particular inquiry outside of MOHELA's general processes for responding to communications?

A. I --

MS. FRADETTE: Object to form. To the extent that you know.

A. I do not. And again, because I only have the inquiry and not necessarily the response, I don't feel I have the full context here.

Q. (By Ms. Haswell) Do you know whether MOHELA reached out to anyone in FSA regarding this correspondence from Mr. Plamondon?

MS. FRADETTE: Object to form and outside the scope of the witness's testimony.

You can answer in your individual capacity to the extent that

you know.
A. I would -- I do not have that information here today.
Q. (By Ms. Haswell) Do you know whether MOHELA investigated internally with respect to whether Mr. Plamondon had loans subject to a group discharge after receiving this correspondence from Mr. Plamondon?
MS. FRADETTE: Object to form and outside the scope.
You can answer in your individual capacity to the extent that you know.
A. Utilizing the policies and procedures that exist that would direct a CAT or credit agent or communication agent to complete a review of the account; however, I don't have the specifics for this response, this work that was completed here.
Q. (By Ms. Haswell) Okay, thank you. Could you please open Exhibit No. 130? And this is the document with the Bates number beginning PLS 000417.
A. Yes. Four pages in the PDF and MOHELA in the top left?

as follows:
"QUESTION: So it is MOHELA's practice to suppress tradelines in that situation outside of any guidance from FSA; is that right?")
THE WITNESS: Thank you.
A. Yes, I can't recall any specific USDS requirements at this time.
Q. (By Ms. Haswell) Okay. So speaking more broadly, if there is not a specific direction from FSA to not suppress credit reporting, MOHELA has the discretion to decide when it can suppress credit -- sorry, suppress consumer tradelines?
MS. FRADETTE: Object to the form, outside the scope.
A. Again, we -- there is the technical ability to suppress a tradeline if needed.
Q. (By Ms. Haswell) Do you remember counsel asking you earlier whether FSA instructed MOHELA that it was allowed to suppress credit reporting for discharges?
MS. FRADETTE: Object to form and misstates the question.
A. I recall the suppression being read in

CERTIFICATE

I, MARY KERKVLIET IVEY, Certified Court Reporter within and for the State of Missouri and Certified Shorthand Reporter within and for the State of Kansas, hereby certify that the within-named witness appeared at the time and place set forth in the caption thereof, was by me first duly sworn to testify the whole truth concerning this matter in controversy; was examined and said examination then and there written by me in machine shorthand, afterwards reduced to writing under my direction, is correctly and accurately set forth in the foregoing pages; and that said deposition is now herewith returned.

I further certify that I am not court reporter, employee, counsel, attorney or relative of either party, or otherwise interested in the event of this suit.

I have hereunto set my hand at my office in Shawnee, Kansas, this 19th day of July, 2026.

MARY KERKVLIET IVEY
CERTIFIED COURT REPORTER MO529
CERTIFIED SHORTHAND REPORTER KS863